**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER SMITH, | : | CASE No: 1:12cv425 |
| Petitioner, | : | JUDGE BLACK |
| v. | : | MAGISTRATE JUDGE MERZ |
| WARDEN, TOLEDO CORRECTIONAL INSTITUTION, | : | |
| Respondent. | : | |

<u>Respondent's Objection to the Magistrate Judge's Report and Recommendation</u>

The magistrate judge issued a Report and Recommendation in the above-captioned case. ECF 115, R&R, beginning at Page ID#3295; *Smith v. Warden*, No. 1:12cv425, 2019 U.S. Dist. LEXIS 193543 (S. D. Ohio November 7, 2019). Respondent respectfully objects to the Magistrate Judge's Report and Recommendation. The Magistrate Judge completely ignored the Sixth Circuit's command in its remand order that the *Brady* and IAAC claims should be decided on the merits in the District Court *in the first instance.* There is no law of the case because the Sixth Circuit refused to consider an issue not within the scope of the Certificate of Appealability and expressly directed that this Court consider whether AEDPA deference applies.

*Contrary to the Magistrate Judge's recommendation, the free-standing ineffective assistance of appellate counsel claim must be considered on the merits in the context of the Brady claim.*

The Sixth Circuit did <u>not</u> conclude that the *Brady* claim was open-and-shut for purposes of the "law of the case" as the Magistrate Judge proposes. The following appears under the heading of *Prejudice* in the Sixth Circuit's decision:

> Further, viewed under the correct standard, there was a reasonable probability of a different outcome had the lab notes been disclosed to the defense. Although it was elicited at trial that Allen was included in the multi-source DNA sample derived from the wig while Smith was excluded, Dr. Heinig testified at the post-trial hearing that she needed the lab notes to understand these results because the report disclosed to the defense before trial did not allow her to determine whether Allen's DNA was found at every locus tested or just one or two loci. Only by reviewing the underlying lab notes was she able to determine that alleles matching Allen's DNA were present at almost every locus tested on the wig. *Of course, this is not conclusive proof that Allen was wearing the wig during the robbery. As Dr. Heinig testified, DNA evidence does not indicate when someone wore or touched an item. Nor does the absence of Smith's DNA definitively prove that Smith never wore the wig.* But the fact remains that "the heavy presence of Charles Allen's DNA . . . was consistent with Allen wearing [and] not just briefly touching the items."

*Smith v. Warden, Toledo Corr. Inst.,* 780 Fed. Appx. 208, 2019 U.S. App. LEXIS 18196 (6th Cir. 2019) (unpublished) at *44-45 (Emphasis added).

The language italicized emphasizes that the Sixth Circuit was not pre-judging the merits of the *Brady* claim because the only way the *Brady* claim can be exculpatory is if the facts result in supporting the defense claim that Allen and not Smith wore an incriminating wig to commit the offenses. Indeed, that is

the only defense claim, to wit: that Allen and not Smith wore an incriminating wig, and thus that Allen, and not Smith, committed the offenses.

Rather the Sixth Circuit discussed the *Brady* claim for the purpose of deciding that a remand to consider the freestanding claim of ineffective assistance of appellate counsel was required in light of the state court's adjudication of the ineffective assistance of appellate counsel claim which was as follows (footnotes omitted):

> …Nor did the court abuse its discretion in denying a new trial on the ground of prosecutorial misconduct in failing to disclose to the defense the lab notes underlying the county's DNA-test results. *Nondisclosure of the lab notes did not violate rights secured to Smith by the Due Process Clause of the Fourteenth Amendment, because the undisclosed evidence was not "material" in that it could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict[s]." And nondisclosure did not deny Smith his Sixth Amendment right to confront the witnesses against him, because the county crime-lab serologist who had generated the DNA-test report testified at trial.* Thus, because the proposed assignment of error would not have presented a reasonable probability of success if it had been advanced on appeal, we cannot say that appellate counsel was ineffective in failing to submit it.

ECF 75, Exhibit 33, Entry denying Application, Page ID#2634-2635 (emphasis added).

Thus, there is a state court adjudication finding no ineffective assistance of appellate counsel that all the parties have agreed from the beginning of this case must be decided on its merits under 28 U.S.C. §2254(d) [the AEDPA]. There is no way to bypass this requirement where the Sixth Circuit noted that this freestanding claim had not been fully briefed and then remanded the case for that specific reason.

As the Sixth Circuit explicitly stated, "As discussed above, this freestanding IAAC claim is subject to AEDPA deference." *Smith v. Warden, Toledo Corr. Inst.,* 780 Fed. Appx. 208, 2019 U.S. App. LEXIS 18196 (6th Cir. 2019) (unpublished) at *51. Moreover, "Smith made only the most barebone of arguments for why he should prevail on this claim on the merits." *Id.* Therefore, according to the Sixth Circuit, "[b]ecause this issue was not adequately briefed before us and its analysis will necessarily overlap with the analysis required for the *Brady* claim, we remand the IAAC claim for the district court to address in light of the above discussion." *Id.*

Yet again, the Sixth Circuit in footnote 5 of its decision in the same section devoted to the freestanding IAAC claim noted as follows:

> It will likely make sense for the district court to first analyze the *Brady* claim on the merits. The proper remedy for a *Brady* claim would be the granting of a conditional writ of habeas corpus unless the State retries Smith. The proper remedy for a freestanding IAAC claim would be granting a writ of habeas corpus unless the State reopens the appeal. <u>Goff, 601 F.3d at 472-73</u> (citing <u>Mapes, 388 F.3d at 193-95</u>).

*Smith v. Warden, Toledo Corr. Inst.,* 780 Fed. Appx. 208, 2019 U.S. App. LEXIS 18196 (6th Cir. 2019) (unpublished) at *51, n. 5.

And, again, as follows:

"We therefore remand Smith's *Brady* claim to the district court to consider on the merits. In so doing, the district court is first required to determine whether this claim was "adjudicated on the merits in [s]tate court proceedings." 28 U.S.C. § 2254(d). If it was, the district court must review the **[*48]** adjudication of this claim under the deferential standard required by AEDPA. *See id.*" *Smith v.*

4

*Warden, Toledo Corr. Inst.,* 780 Fed. Appx. 208, 2019 U.S. App. LEXIS 18196 (6th Cir. 2019) (unpublished) at *48.

The state Court of Appeals adjudicated the *Brady* claim and found that it was not "material" and could not reasonably be taken to undermine confidence in the verdict. ECF 75, Exhibit 33, Entry denying Application, Page ID#2634-2635 (emphasis added) cited above. *Fairchild v. Workman,* 579 F.3d 1134, 1148 n. 6 (5th Cir. 2009) (Holding that if the state court first analyzes the proffered non-record evidence against the *Strickland* standard, concludes that even if admitted the evidence would not entitle the petitioner to habeas relief, and then denies the motion for an evidentiary hearing, the court has made a determination on the merits that is entitled to AEDPA deference.)

This is not what the Report and Recommendation recommends.

The Magistrate Judge errs in concluding that this petition can be decided without reviewing the *Brady* claim in the context of the freestanding ineffective assistance of appellate counsel claim.

Thus, there is more work to be done to decide the freestanding ineffective assistance of appellate counsel claim as decreed by the Sixth Circuit which is the essential issue that has undergirded this case from the beginning.

*Even if the "law of the case" applied, it should not be applied in this case because to do so would create a manifest injustice.*

The Magistrate Judge is correct that the law of the case is not an inexorable command but rather a rule of efficiency subject to objection for a manifest

5

injustice. ECF 115, R&R, Page ID#3292, citing *White v. Murtha,* 377 F.2d 428, 431-432 (5th Cir. 1967).

Respondent has previously argued the remarkable facts of this case that establish a manifest injustice. ECF 103, Response to Petitioner's brief on remand, beginning at Page ID#3218.

Respondent will not re-argue at length the analysis previously presented but will limit the present response to a single challenge to the petitioner and the Court, to wit: that the post-conviction petition and the testimony of the defense expert, Dr. Heinig, never supported the defense theory of the case. If this fact is true, then this whole proceeding has been a matter of smoke and mirrors from the beginning.

According to Dr. Heinig's testimony, the DNA was from "a mixed profile and more than one individual is present and that Charles Allen could not be excluded." Tr. Vol. X, 1104, Page ID#1537. At the hearing Dr. Heinig twice did not testify in a way to support the defense theory of the DNA evidence.

> (Questions from the Court in progress)
>
> So, I have no doubt that Charles Allen touched these items; the wig the t-shirt, the sunglasses, maybe he put them on, maybe he was wearing them, and that's why he has heavy presence on them. So, let's say he was wearing them and at some point during this planned robbery he turns those over as a disguise to Chris Smith. Chris Smith puts them on, commits the robbery and comes back out. Well, clearly Charles Allen would mask, you can't say Chris Smith did not have these on, right? Especially with heavy masking that you're saying from Charles Allen.
>
> THE WITNESS: *I am unable to comment if Chris Smith did put this on, you know, would for sure his DNA be on there.*
>
> THE COURT: Right, might not have.

6

THE WITNESS: Yeah, and then—

THE COURT: *You're talking about heavy, heavy, heavy presence of somebody can mask anybody else's DNA.*

THE WITNESS: *Yeah,* I think just bottom line, though, the more exposure you have to an item, the longer you're wearing it, that kind of thing. The ability to get the DNA from that individual—

THE COURT: Is greater.

THE WITNESS: *--is more likely, is greater.*

THE COURT: *But also could possibly mask the defendant, mask DNA from somebody else?*

THE WITNESS: *If it's a quick touch situation like that and not as much DNA, that's right.*

THE COURT: All right.

Tr. Vol X, 1126-1127; Page ID#1559-1560 (emphasis supplied).

The closest Dr. Heinig comes to endorsing the defense theory of the DNA in the case is to comment that if she were reviewing the case for the state, she "would discuss the results" with the prosecution.

> Q. Okay. And so, if you were reviewing this case for the State, Dr. Heinig, and the prosecutor came to you with that theory that Christopher Smith was the robber and Chuck Allen, Charles Allen, was not, would you notify the prosecutor that his theory is inconsistent with the DNA results here?
>
> A. We would discuss the results and that fact that Christopher Smith would be excluded, yes, and then Charles Allen could not be excluded. *So we would discuss that*, yes.
>
> Q. Okay. And does the heavy presence of Charles Allen and so forth in contrast with—
>
> A. Yeah, that's right. So if the prosecutor is familiar with the report, I would want to delve into, well, we will have to look at the allelic

7

> chart, and we do have a profile here across the board. And get into that more the idea of mere touch versus possibly wearing the wig or the sunglasses.

Tr. Vol X, 1124; Page ID#1557 (emphasis supplied)

The testimony goes on from this point to discuss the masking effect and other matters. Dr. Heinig never states the only expert conclusion that could exonerate Smith, namely that the absence of his DNA indicated that he was innocent of the robbery. Without that testimony there is no *Brady* claim at all premised on the DNA evidence because the testimony both at trial and post-trial was Smith could have worn the wig, for example, to commit the robbery without leaving DNA on it especially where there was so much of Allen's DNA already on the item.

Nor was the testimony of Dr. Heinig post-trial impeaching of the state's witness and his testimony at trial. The witness Sundermeier, a serologist from the Hamilton County Coroner's Office, testified Smith's DNA was excluded from the wig although that does not mean that Smith never touched or possessed the wig. Tr. 348-349; Page ID#781-782 of ECF 12-4.

There has been no rebuttal attempted regarding these facts: the crucial— indeed necessary—facts of the case pertinent to the *Brady* claim.

In addition, because the overall strength of the case is a feature of any claim of ineffective assistance of counsel as to prejudice, it will be helpful to review the factual determination of the state Court of Appeals. 28 U.S.C. §2254(e)(1) [presumption of correctness].

> One afternoon, a man wearing a wig and sunglasses entered a Cincinnati Bell Wireless store brandishing a gun. He ordered the

8

patrons to the floor and demanded money from the store manager. The manager opened the cash register, and the gunman fled with the store's till.

Thomas Moore was driving by the store immediately before the robbery. He saw the man put on the wig and sunglasses and enter the store. With his suspicion aroused, Moore stopped his car and observed the store. He saw the man emerge from the store and get into a blue Ford Expedition. Moore followed the Expedition and saw the man whom he would ultimately identify as Smith sitting in the passenger side of the vehicle. When Moore saw Smith, he was no longer wearing the disguise.

Soon after the robbery, police found the Expedition in the vicinity of Smith's residence. Near the vehicle, they found a wig, sunglasses and a black T-shirt. The Expedition's license plate led the police to one of Smith's girlfriends, who testified that she had given the vehicle to Smith.

On the afternoon of the robbery, Smith, a parolee, cut off his electronic· monitoring ankle bracelet and absconded. Cellular telephone records established that he had told another girlfriend to report that the Expedition had been stolen.

The theory of the defense was that Charles Allen had borrowed the car and had committed the robbery without Smith's participation. Deoxyribonucleic acid (DNA) taken from the wig, sunglasses, and T-shirt revealed a match with Allen's DNA, whereas none of Smith's DNA was discovered. The defense also offered the out of-court statements of Allen suggesting that Smith had not been involved.

In rebuttal, the state presented the testimony of Allen, who testified that he had driven Smith from the crime scene in the Expedition. The trial court found Smith guilty and sentenced him to an aggregate term of 27 years and 107 days in prison.

    \* \* \*

In this case the convictions were in accordance with the evidence. The eyewitness testimony, Smith's ownership of the Expedition, and his dismantling of the electronic-monitoring device all indicated that he had been the culprit of the armed robbery. It was undisputed that he was under a disability.

Although only Allen's DNA was found on the items recovered by police, there was expert testimony that a person could handle or

9

> wear an item without leaving behind DNA. And in light of the inconsistent statements given by Allen, the trial court could have reasonably given little weight to the defense's insistence that Allen's out-of-court statements had exculpated Smith. The trial court did not lose its way in finding Smith guilty, and we overrule the fourth assignment of error.

ECF 75, Exhibit 24, Judgment entry, Page ID#2579-2580 and 2583.

The Ohio Court of Appeals' determination is buttressed and amplified—not contradicted—by the actual record.

Therefore, respondent challenges the petitioner and the Magistrate Judge and this Court to decide that there ever was a *Brady* claim at all where the single witness in the post-conviction petition never testified in any way that could have exculpated Smith in the only way the defense could claim, to wit: that Allen and not Smith wore an incriminating wig to commit the offenses.

The record will demonstrate that at the oral argument in the Sixth Circuit the respondent presented these facts and the transcript citations to the panel of the Sixth Circuit, and the panel noted the respondent's citation to the record that is recited above. It is time this factual question received the attention it is due.

If this challenge cannot be met, then there is only one recourse for this Court to take. Deny the entire federal habeas petition.

## CONCLUSION

At a minimum, there must be a remand as directed by the Sixth Circuit to consider the freestanding claim of ineffective assistance of appellate counsel. The Sixth Circuit said so and should be obeyed.

In addition, this Court should examine the record to determine if there *ever* were a *Brady* claim at all where the single witness post-trial never bought into the defense theory of the case—and the only theory—that Allen and not Smith wore an incriminating wig to commit the offenses.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

s/William H. Lamb (0051808)
WILLIAM H. LAMB
Assistant Attorney General
Criminal Justice Section
441 Vine Street, 1600 Carew Tower
Cincinnati, Ohio 45202
(513) 852-1529
(877) 634-8140 (FAX)
william.lamb@ohioattorneygeneral.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of November, 2019, respondent's opposition was filed electronically with the Court. Counsel for Smith may obtain a copy of respondent's response through the Court's electronic filing system.

s/William H. Lamb
WILLIAM H. LAMB
Assistant Attorney General
