# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER SMITH, | : | Case No. 1:12-cv-425 |
| | : | |
| Petitioner, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | Magistrate Judge Michael R. Merz |
| | : | |
| WARDEN, Toledo Correctional | : | |
| Institution, | : | |
| | : | |
| Respondent. | : | |

## DECISION AND ENTRY ADOPTING
## THE REPORT AND RECOMMENDATION OF THE
## UNITED STATES MAGISTRATE JUDGE (Doc. 115)
## AS MODIFIED HEREIN

This case is before the Court pursuant to the Order of General Reference to United States Magistrate Judge Michael R. Merz.

Pursuant to such reference, the Magistrate Judge reviewed the pleadings and, on November 7, 2019, issued a Report and Recommendation, recommending that this Court issue a conditional writ of habeas corpus as to Petitioner Christopher Smith ("Petitioner"). (Doc. 115).

On November 20, 2019, Respondent filed objections to the Report and Recommendation. (Doc. 116). And, on November 26, 2019, Petitioner filed a response in opposition to the objections. (Doc. 117). The Court also has before it the relevant trial court documents relating to Petitioner's criminal conviction.[1]

---

[1] The transcripts of the state trial proceedings are filed on the docket of this case at Doc. 12-2 through 12-12. Additionally, the state court record is filed on the docket of this case at Doc. 75.

# I. BACKGROUND[2]

## A. State Trial Proceedings

In 2007, the Hamilton County Grand Jury returned an indictment, charging Petitioner with the following offenses: aggravated robbery in violation of Ohio Revised Code § 2911.01(A)(1) with specifications (Count 1); robbery in violation of Ohio Revised Code § 2911.02(A)(2) (Count 2); and having weapons while under disability in violation of Ohio Revised Code § 2923.13(A)(2) (Count 3). (Doc. 75 at 7–10).

In 2008, Petitioner's case proceeded to a bench trial, conducted by Judge Robert P. Ruehlman.[3] (*See* Doc. 12-2). At the bench trial, evidence was presented that, on October 17, 2007, an armed robber, wearing sunglasses, a facemask, and a wig, took $700 to $800 from a wireless telephone store in Cincinnati, Ohio. (Doc. 12-3 at 10–14, 28–32, 36). Evidence was also presented that, after the robbery was complete, the robber ran to a Ford Expedition, parked at a nearby apartment complex, and climbed into the passenger seat. (*Id.* at 49–52).

Two eyewitnesses identified Petitioner as the alleged robber.

The first eyewitness was an individual named Thomas Moore ("Moore"). (*Id.* at 46). Moore testified that he noticed the robbery in progress while passing by the wireless telephone store, and that he followed the Ford Expedition from the nearby apartment complex. (*Id.* at 47–52, 62–65). Moore further testified that he saw Petitioner in the

---

[2] *Smith v. Warden, Toledo Corr. Inst.*, 780 F. App'x 208 (6th Cir. 2019), contains a full recitation of the facts applicable to this case. This Court incorporates those facts herein by reference.

[3] Petitioner waived his right to a jury trial. (Doc. 75 at 40).

passenger side of the vehicle while in pursuit. (*Id.* at 62–67, 72–77). Moore testified that he called 911 while the robbery was ongoing to provide the police with a partial license plate number. (*Id.* at 77–78).

The second eyewitness was an individual named Charles Allen ("Allen").[4] (Doc. 12-8 at 2). Allen testified that he rode with Petitioner to the nearby apartment complex, unaware of Petitioner's alleged intent to rob the wireless telephone store, then waited in the Ford Expedition while Petitioner made a "phone call." (*Id.* a 26–27, 77–78). Allen further testified that, after about five minutes, Petitioner ran back to the car, and told Allen to "drive, drive." (*Id.* at 26–29). Allen testified that he obliged (*i.e.*, drove), then left Petitioner and the vehicle at a different apartment complex.[5] (*Id.* at 26–29, 37–38).

The State also proffered the testimony of Tracy Sundermeier ("Sundermeier"), a serologist employed by the Hamilton County Coroner's Crime Laboratory, who presented a DNA lab report at the bench trial. (Doc. 12-4 at 9–10, 14). Sundermeier testified that she had swabbed a wig found near the Ford Expedition; had created a profile from the DNA recovered; and had compared the DNA profile created to Petitioner's and Allen's DNA. (*Id.* at 27, 45–46). Further, Sundermeier testified that, based on her analysis: Petitioner was <u>excluded</u> from the DNA profile; Allen <u>could not be excluded</u> from the DNA profile; and the portion of the population that could not be excluded from

---

[4] In exchange for his testimony, the State promised Allen that he would not be prosecuted for this crime. (Doc. 12-8 at 2–3).

[5] The Ford Expedition was later determined to belong to Petitioner's girlfriend, and the apartment complex at which it was left, along with the wireless telephone store, were in the vicinity of Petitioner's home. (Doc. 12-3 at 96–99, 155–62).

the DNA profile was 1 in 3.44 million. (*Id.* at 45–46). In other words, Sundermeier

testified that, based on her analysis, while Petitioner's DNA was not on the wig, in all

likelihood, Allen's was.[6] (*See id.* at 45–49).

Petitioner maintained his innocence throughout the criminal proceedings,

including the bench trial. (*See* Doc. 12-9 at 95–96). At trial, the defense's position was

that Petitioner was not involved in the robbery and that Allen was in fact the robber. (*Id.*

at 21–27, 75–76, 88). Indeed, Petitioner asked the State to "run the [DNA] test" in an

effort to prove that he played no part in the crime. (*Id.* at 29–30).

At the conclusion of the bench trial, the state trial court commented on the DNA

evidence presented by Sundermeier as follows:

> [W]hen you touch something, sometimes your cells come off,
> sometimes they don't, you know, sometimes—I don't have a
> problem with the fact that [Petitioner] put the wig on but his
> DNA was not found on it but [] Allen's was, because he was in
> the car, too, he touched it also.

(*Id.* at 91).

After commenting on the DNA evidence, and notwithstanding the defense's

theory that Allen, rather than Petitioner, was the real culprit, the state trial court found

Petitioner guilty on all counts, and sentenced Petitioner to 26 years in prison. (*Id.* at 118–

19). The state trial court asserted that, when Moore's testimony, Allen's testimony, and

---

[6] Sundermeier also tested a t-shirt and sunglasses, both of which were found with the wig, at the
apartment complex where the Ford Expedition was left. (Doc. 12-4 at 20, 28). Sundermeier
obtained a DNA profile from the t-shirt. (*Id.* at 19–20). Petitioner was excluded from the DNA
profile; Allen could not be excluded from the DNA profile. (*Id.*) Sundermeier claimed that she
could not recover any DNA from the sunglasses. (*Id.* at 28).

the DNA results were considered cumulatively, all the evidence "add[ed] up to one thing[—]that [Petitioner] did in fact commit this offense." (*Id.* at 92).

## B. State Post-trial Proceedings

After the conclusion of the bench trial, the State disclosed new evidence to Petitioner: the laboratory notes underlying Sundermeier's DNA testing. (Doc. 75 at 93). Upon receipt of the laboratory notes, Petitioner moved for a new trial under Ohio Rule of Criminal Procedure 33.[7] (Doc. 75 at 92–96). In his new trial motion, Petitioner explained that, while the State had disclosed Sundermeier's laboratory report to Petitioner prior to trial, the State had failed to disclose Sundermeier's laboratory notes to Petitioner prior to trial. (*See id.*). And Petitioner argued that, by failing to so disclose the laboratory notes, the State had withheld material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Doc. 75 at 92–96). Petitioner also sought relief on various other grounds. (*Id.* at 54–78).

On August 11, 2009, the state trial court held a hearing on Petitioner's new trial motion. (Doc. 12-11). Dr. Julie Heinig ("Dr. Heinig"), a DNA expert, testified for Petitioner. (*Id.* at 3). Dr. Heinig explained that, while the laboratory report was sufficient to show the type of DNA on the wig, the laboratory notes were necessary to determine the amount of DNA on the wig. (*Id.* at 6–10, 32–34, 39–40). Dr. Heinig explained that, only by reviewing the laboratory notes, was she able to determine that

---

[7] To be precise, Petitioner moved to supplement a previous motion for a new trial under Ohio Rule of Criminal Procedure 33. (Doc. 75 at 54, 93).

alleles consistent with Allen's DNA were present at almost every locus tested on the wig.[8]  (*Id.* at 15).

Dr. Heinig testified that the amount of DNA found on the wig was likely not consistent with Allen briefly touching the wig, but actually wearing it.  (*Id.* at 17–18, 32–34).  And Dr. Heinig asserted that, while it was possible that Petitioner had worn the wig without leaving behind DNA, and while it was possible that someone else's DNA had "masked" Petitioner's DNA (such as in a "quick touch situation"), the longer someone wears an item, the more likely it is that he/she will deposit identifiable DNA.  (*Id.* at 23–27, 37–38, 47).

At the end of the new trial hearing, Petitioner's counsel presented an extensive oral argument, citing both Dr. Heinig's testimony and analogous cases, which focused "[f]irst, and most importantly" on Petitioner's *Brady* claim.  (*Id.* at 48–58).  In response, the state trial court presented the following thoughts:

> [Y]ou might have an argument if you're trying [the case] to a jury, but you're trying the case to me, and I'm also deciding this motion for [a] new trial.  I think I made it clear in my findings initially that when I talked about this, I have no doubt that both these guys were involved in this.
>
> [. . .]
>
> [I]t could very possibly be that [] Allen wore this outfit and had this on numerous occasions on other robberies, or even that day wore it and gave it to [Petitioner] to wear, that's why he has a

---

[8] In addition to examining the laboratory notes, Dr. Heinig conducted her own DNA testing of the wig, t-shirt, and sunglasses.  (Doc. 12-11 at 10–11).  Dr. Heinig's DNA testing largely aligned with Sundermeier's.  (*See id.*).  However, unlike Sundermeier, Dr. Heinig was able to obtain a DNA profile from the sunglasses.  (*Id.* at 21).  Petitioner was excluded from that DNA profile; Allen was not.  (*Id.*)

> heavy presence of DNA on it, and that would mask
> [Petitioner's] DNA when he wore it.

(*Id.* at 58–59, 61).

The state trial court then informed the parties that it needed "a couple weeks to look this [all] over" and adjourned the hearing on Petitioner's new trial motion. (*Id.* at 64, 68). Subsequently, on September 10, 2009, the state trial court denied Petitioner's new trial motion in a written entry stating in full as follows: "The defendant's Rule 33 motion for New Trial is hereby denied." (Doc. 75 at 102).

On September 15, 2009, Petitioner filed a notice of direct appeal to the First District Court of Appeals (the "First District"). (*Id.* at 103). Petitioner's direct appeal did not include any reference to the alleged *Brady* violation. (*Id.* at 104–23). On review, the First District affirmed the state trial court's judgment but remanded for resentencing. (*Id.* at 146–51).

On August 3, 2010, Petitioner filed a Rule 26(B) application to reopen his direct appeal. (*Id.* at 182). The Rule 26(B) application asserted that Petitioner's appellate counsel was ineffective for, *inter alia*, failing to raise on appeal the state trial court's rejection of Petitioner's *Brady* claim, in its denial of Petitioner's motion for a new trial. (*Id.* at 182–92).

Thereafter, of February 7, 2011, the First District entered a decision, finding that Petitioner had failed to present a colorable ineffective assistance of appellate counsel claim. (*Id.* at 200–02). Specifically, the First District found that the state trial court had not abused its discretion in denying Petitioner's motion for a new trial and noted that,

with regard to the *Brady* claim, the undisclosed laboratory notes "could not 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (*Id.* at 201 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995))).

## C. Federal Habeas Proceedings

While his state court proceedings were ongoing, Petitioner applied for a writ of habeas corpus in this Court. (Doc. 1). Petitioner raised seven grounds for relief, only two of which—Grounds I and VII—remain relevant to this Order. (Doc. 80 at 1–2). The first ground asserted that the State had committed a *Brady* violation by failing to disclose the laboratory notes to Petitioner prior to the commencement of the bench trial ("ground one" or the "*Brady* claim"). (*Id.* at 1). The seventh ground asserted that Petitioner's appellate counsel had rendered ineffective assistance by failing to raise, *inter alia*, a *Brady* claim on direct appeal ("ground seven" or the "IAAC claim"). (*Id.* at 2, 22).

On August 29, 2016, the Magistrate Judge issued a Report and Recommendation, recommending that this Court dismiss Petitioner's petition in its entirety. (*Id.* at 26). The Magistrate Judge concluded that grounds one through six of Petitioner's petition were either procedurally defaulted or not cognizable. (*See id.* at 10–22). And the Magistrate Judge concluded that, to the extent that it was not procedurally defaulted, ground seven of Petitioner's petition failed on the merits. (*See id.* at 22–26).

On February 8, 2017, this Court issued a Decision and Entry, adopting the Report and Recommendation. (Doc. 85). However, the Court also issued a certificate of appealability. (Doc. 98). With regard to ground one (the *Brady* claim), the certificate of appealability encompassed "whether the Court was correct in finding a procedural

default, whether the Court was correct in finding no excuse to the procedural default exists, and whether the Court was correct in not considering the merits of this claim." (*Id.* at 13). With regard to ground seven (the IAAC claim), the certificate of appealability also included "whether the Petition state[d] a valid claim for ineffective assistance of appellate counsel." (*Id.* at 17).

On March 10, 2017, Petitioner filed a notice of appeal with the United States Court of Appeals for the Sixth Circuit. (Doc. 92). And thereafter, on June 18, 2019, the Sixth Circuit issued an Opinion on Petitioner's appeal. (Doc. 99).

In its Opinion, the Sixth Circuit concluded that grounds one through six of Petitioner's petition were procedurally defaulted. (*Id.* at 17). However, the Sixth Circuit also concluded that ineffective assistance of appellate counsel excused the procedural default with regard to ground one (the *Brad*y claim). (*Id.* at 32).

In reaching this conclusion, the Sixth Circuit performed an initial analysis of Petitioner's *Brady* claim, and the Sixth Circuit concluded that Petitioner's *Brady* claim was "significant," "obvious," and material. (*Id.* at 30–32; *see also id.* at 31("In a case with stronger evidence, the suppressed evidence might not be enough to create a reasonable probability of a different outcome. But, here, it is sufficient to undermine[] confidence in the outcome of the trial." (quotation marks and citation omitted)). Moreover, the Sixth Circuit noted that, by denying Petitioner's *Brady* arguments, post-trial, the state trial court likely "misapprehend[ed] and misappl[ied] Supreme Court precedent." (*Id.* at 30).

After setting forth this analysis, the Sixth Circuit remanded the case to this Court

for a merits-based consideration of Petitioner's *Brady* and IAAC claims. (*Id.* at 32, 35).

With regard to Petitioner's *Brady* claim, the Sixth Circuit stated as follows:

> We . . . remand [Petitioner]'s *Brady* claim to the district court
> to consider on the merits. In so doing, the district court is first
> required to determine whether this claim was "adjudicated on
> the merits in [s]tate court proceedings." 28 U.S.C. § 2254(d).
> If it was, the district court must review the adjudication of this
> claim under the deferential standard required by AEDPA. *See
> id.*

(*Id.* at 32).

And, with regard to Petitioner's IAAC claim, the Sixth Circuit stated as follows:

> [Petitioner] made only the most barebone of arguments for why
> he should prevail on th[e] [IAAC] claim on the merits. . . .
> Because this issue was not adequately briefed before us and its
> analysis will necessarily overlap with the analysis required for
> the *Brady* claim, we remand the IAAC claim for the district
> court to address in light of the above discussion.

(*Id.* at 34–35).

In short, the Sixth Circuit instructed this Court to engage in three points of inquiry

on remand: (A) a consideration of whether the state courts had adjudicated Petitioner's

*Brady* claim on the merits; (B) a consideration of the merits of Petitioner's *Brady* claim;

and (C) a consideration of the merits of Petitioner's IAAC claim. (*Id.* at 32, 35).

On November 7, 2019, the Magistrate Judge issued a Report and

Recommendation, addressing each of the Sixth Circuit's points of inquiry. (Doc. 115).

At the end of the Report and Recommendation, the Magistrate Judge recommended that

this Court issue a conditional writ of habeas corpus, requiring the State to release

Petitioner unconditionally or retry Petitioner within six months of the date of judgment. (*Id.* at 13).

Thereafter, on November 20, 2019 Respondent filed objections to the Report and Recommendation. (Doc. 116). And, on November 26, 2019, Petitioner filed a response in opposition to the objections. (Doc. 117). This case is now ripe for this Court's review.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs habeas applications. 28 U.S.C. § 2254. A habeas application does not provide a petitioner with an opportunity to retry his state court conviction in federal court. *Herrera v. Collins*, 506 U.S. 390, 401–02 (1993). Instead, a habeas application provides a petitioner with an opportunity to show that his state court conviction violates federal law. 28 U.S.C. § 2254(a).

If the claim set forth in the habeas application has already been adjudicated by the state courts "on the merits," then a highly deferential standard of review applies. 28 U.S.C. § 2554(d). As set forth in AEDPA, the district court can only grant habeas relief if the state court conviction (1) unreasonably applied Supreme Court precedent; or (2) turned on unreasonable factual findings. *Stewart v. Trierweiler*, 867 F.3d 633, 636 (6th Cir. 2017) (citing 28 U.S.C. § 2554(d)).

If, however, the claim set forth in the habeas petition has not been adjudicated by the state court, "on the merits," then a more plenary standard of review applies. *Cone v. Bell*, 556 U.S. 449, 472 (2009). As set forth in *Marion*, the district court must review questions of law under a *de novo* standard and questions of fact under a clear error

standard.  *Marion v. Woods*, 663 F. App'x 378, 381 (6th Cir. 2016) (citing *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011)).

## III.  ANALYSIS

On review, this Court agrees, in large part, with the Magistrate Judge's Report and Recommendation and ultimate conclusions.  (Doc. 115).  For purposes of this Order, the Court will analyze each of the Sixth Circuit's points of inquiry.  (Doc. 99).  Thereafter, this Court will address the remaining objections submitted by Respondent, as well as whether it is appropriate to issue a conditional versus an unconditional writ of habeas corpus.  (Doc. 116).

### A.  Decision on the Merits

First, the Sixth Circuit instructed this Court to consider whether the state courts adjudicated Petitioner's *Brady* claim on the merits.  (Doc. 99 at 32).  This threshold inquiry determines whether the deferential standard set forth in AEDPA will govern this Court's subsequent analysis.  28 U.S.C. § 2554(d); *Marion*, 663 F. App'x at 381.

In the Report and Recommendation, the Magistrate Judge concluded that the First District's February 7, 2011 decision did not adjudicate Petitioner's *Brady* claim on the merits.  (Doc. 115 at 4–6).  This Court concludes that, while the Magistrate Judge's thoughtful analysis of the First District's February 7, 2011 decision is correct, there is nonetheless more work to be done.  (*Id.*)  This is because, while the First District did not decide Petitioner's *Brady* claim on the merits, the state trial court did.  (Doc. 75 at 102).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits

in the absence of any indication or state-law procedural principles to the contrary."
*Harrington v. Richter*, 562 U.S. 86, 99 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)); *Richardson v. Palmer*, 941 F.3d 838, 848 (6th Cir. 2019) (same). This presumption applies regardless of whether the state court articulated the rationale underlying its decision. *Harrington*, 562 U.S. at 98–99. But this "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99–100.

Here, the state trial court adjudicated Petitioner's *Brady* claim on the merits.

Petitioner presented his *Brady* claim to the state trial court in a new trial motion. (Doc. 75 at 92–96). Thereafter, the state trial court denied Petitioner's *Brady* claim, along with the rest of his new trial motion, in a September 10, 2009 decision. (*Id.* at 102). The September 10, 2009 decision does not explain why the state trial court denied Petitioner's *Brady* claim. (*Id.*) To the contrary, it states in full as follows: "The defendant's Rule 33 motion for New Trial is hereby denied." (*Id.*) Nonetheless, Supreme Court precedent requires this Court to presume that the state trial court denied Petitioner's *Brady* claim on the merits. *Harrington*, 562 U.S. at 99 (presuming that a summary order constituted an adjudication on the merits for AEDPA purposes); *Hynes v. Birkett*, 526 F. App'x 515, 519 (6th Cir. 2013) (same).

On this Court's review, no evidence in the record overcomes the presumption set forth in *Harrington*. 562 U.S. at 99. To the contrary, the new trial hearing, which took place prior to the issuance of the September 10, 2009 decision, strongly indicates that a merits-based decision occurred. At the new trial hearing, Petitioner's counsel presented

an extensive oral argument, focusing "most importantly" on Petitioner's *Brady* claim.

(Doc. 12-11 at 48–58). After the oral argument, the state trial court addressed the merits

of the case, including the *Brady* claim, and told the parties that it needed "a couple weeks

to look this [all] over[.]" (*Id.* at 58–64). These proceedings therefore show that the

merits of Petitioner's *Brady* claim, rather than its procedural nature, were at issue leading

up to the September 10, 2009 decision.[9] (Doc. 75 at 102).

Based upon the foregoing, with regard to the Sixth Circuit's first point of inquiry,

this Court concludes that the state courts adjudicated Petitioner's *Brady* claim on the

merits.

### B. Merits of the Brady Claim

Next, the Sixth Circuit instructed this Court to consider the merits of Petitioner's

*Brady* claim. (Doc. 99 at 32). As the state courts—specifically, the state trial court—

adjudicated Petitioner's *Brady* claim on the merits, the deferential standard set forth in

AEDPA governs this Court's analysis of the same. 28 U.S.C. § 2554(d).

In the Report and Recommendation, the Magistrate Judge concluded that

Petitioner's *Brady* claim was meritorious, and that habeas relief was appropriate. (Doc.

115 at 6–13). The Magistrate Judge reached this conclusion after noting that the Sixth

---

[9] In his briefing on remand, Petitioner claims that this Court should analyze the First District's February 7, 2011 decision to determine whether the state courts have adjudicated Petitioner's *Brady* claim on the merits. (Doc. 102 at 1 n.1 (citing the "last explained decision" rule set forth in *Ylst v. Nunnemaker*, 501 U.S. 797 (1991)). But this Court disagrees. As the Magistrate Judge correctly noted in the Report and Recommendation, Petitioner's *Brady* claim was not actually before the First District in the February 7, 2011 decision—Petitioner's IAAC claim was. (Doc. 115 at 4–6). Thus, it makes little sense to this Court to look to that decision to see whether a merits-based adjudication of Petitioner's *Brady* claim occurred.

Circuit's June 18, 2019 Opinion had effectively analyzed Petitioner's *Brady* claim—albeit in the context of an ineffective assistance of appellate counsel analysis. (*Id.*) Thus, the Magistrate Judge adopted the Sixth Circuit's conclusions as his own under the law of the case doctrine. (*Id.*) On review, this Court agrees with the Magistrate Judge's ultimate conclusion. And, as set forth *infra*, this Court reaches that same ultimate conclusion upon review of Petitioner's *Brady* claim, even under the deferential standard set forth in AEDPA.

In this case, Petitioner asserts that, while the State disclosed Sundermeier's laboratory report timely, the State failed to disclose Sundermeier's laboratory notes until after the bench trial concluded and Petitioner was convicted. (Doc. 75 at 92–96). And Petitioner argues that, by failing to disclose the laboratory notes to Petitioner, the State committed a *Brady* violation. (*See id.*).

On review, as explained *infra*, this Court agrees. In response to the Sixth Circuit's inquiry, the Court will first consider the merits of the *Brady* claim, then the Court will consider the state trial court's decision under the AEDPA standard.

### 1. *Brady*

Under *Brady*, the State's failure to disclose "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Disclosure of impeachment evidence, as well as exculpatory evidence, is required under *Brady*. *Bagley*, 473 U.S. at 676. Further, "there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to

be disclosed even without a specific request." *United States v. Agurs*, 427 U.S. 97, 110 (1976).

As an initial matter, the Court finds that the State withheld material evidence from Petitioner. Evidence is "material" when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 556 U.S. at 469–70. A reasonable probability exists "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

Here, the laboratory notes were material to Petitioner's case.

At the bench trial, the state trial court concluded that Petitioner, rather than Allen, was the wig-clad robber who held up the wireless telephone store on October 17, 2007. (Doc. 12-9 at 92). The state trial court reached this conclusion notwithstanding the fact that, according to the laboratory report, DNA consistent with Allen, rather than Petitioner, was on the wig. (Doc. 12-4. at 45–49). In rationalizing its verdict, the state trial court stated as follows: "I don't have a problem with the fact that [Petitioner] put the wig on but his DNA was not found on it but [] Allen's was, because [Allen] was in the car, too, [Allen] touched [the wig] also." (Doc. 12-9 at 91 (emphasis added)).

While the state court's rationale may have been consistent with the evidence in the laboratory report, the state court's rationale falls apart when considered in light of the evidence in the laboratory notes. Dr. Heinig's testimony at the new trial hearing confirms this point. Specifically, Dr. Heinig testified that, while the laboratory *report* was sufficient to show the <u>type</u> of DNA on the wig, the laboratory *notes* were necessary to

show the <u>amount</u> of DNA on the wig. (Doc. 12-11 at 6–10, 32–34, 39–40). Dr. Heinig explained that, based on the laboratory notes, alleles consistent with Allen's DNA were present at <u>almost every locus tested on the wig</u>. (*Id.* at 15). And Dr. Heinig testified that, when the amount, not just the type, of DNA on the wig was considered, it became clear that <u>Allen had most likely worn the wig, not just touched it</u>. (*Id.* at 17–18, 32–34). This evidence directly undercuts the rationale articulated by the state trial court at the bench trial.

To be sure, the laboratory notes do not conclusively prove that Allen, rather than Petitioner, wore the wig on the day of the robbery. Dr. Heinig, herself, testified that it was possible for Petitioner to have worn the wig without leaving behind any identifiable DNA. (*Id.* at 23–27, 37–38). But when the fact that DNA consistent with Allen was heavily present on the wig, is considered <u>together with</u> the fact that DNA consistent with Petitioner was completely absent from the same, a natural inference arises—that Allen, rather than Petitioner, was the wig-clad robber who held up the wireless telephone store on October 17, 2007. (*See id.* at 15, 17–18, 32–34; Doc. 12-4. at 45–49). Of course, this natural inference strongly supports Defendant's theory of the case: that Allen rather than Petitioner committed the crime.[10]

The Court concludes that, had the laboratory notes been disclosed, there is a reasonable probability that the result of the proceeding would have been different. *Cone*,

---

[10] And, of course, this natural inference gains even greater force when it is considered in light of the fact that Petitioner was also excluded as a contributor to the DNA found on the t-shirt and sunglasses, whereas Allen was not. (Doc. 12-4 at 20; Doc. 12-11 at 10–11, 21).

556 U.S. at 469–70; *see also Kyles*, 514 U.S. at 434.  Accordingly, the laboratory notes constitute material evidence, and the State's failure to disclose them pre-trial amounts to a *Brady* violation.[11]

### 2.  *AEDPA*

Having found that Petitioner's *Brady* claim has merit, this Court must still consider whether the state trial court's rejection of the same survives the highly deferential standard set forth in the AEDPA.  *Harrington*, 562 U.S. at 105.  A federal court can only grant habeas relief under the AEDPA if the state court conviction: (1) unreasonably applied Supreme Court precedent; or (2) turned on unreasonable factual findings.  *Stewart*, 867 F.3d at 636 (citing 28 U.S.C. § 2554(d)).

Here, the state trial court unreasonably applied both law and facts.[12]

As an initial matter, based on the transcript of the new trial hearing, the state trial court misapplied *Brady*.  (*See* Doc. 12-11).  At the new trial hearing, Petitioner's counsel presented an extensive oral argument, focusing "most importantly" on Petitioner's *Brady* claim.  (*Id*. at 48–58).  In response, the state trial court stated as follows: "[Y]ou might have an argument if you're trying [the case] to a jury, but you're trying the case to me,

---

[11] Were this Court reviewing the *Brady* claim under a *de novo* standard, the Court's consideration would end here, having found that a meritorious *Brady* claim exists.  Thus, even if this Court should have considered the First District's decision—which did not adjudicate the *Brady* claim on the merits (*see* Doc. 115 at 4-6)—Petitioner would still prevail.

[12] As the state trial court rejected Petitioner's *Brady* claim in a summary entry (Doc. 75 at 102), the state trial court's comments at the new trial hearing present the sole explanation of the rationale underlying its decision.  (Doc. 12-11 at 58–59, 61); *cf. Harrington*, 562 U.S. at 102 (confirming that, "[u]nder § 2254(d), a habeas court must determine <u>what arguments or theories supported or, as here, could have supported</u>, the state court's decision" (emphasis added)).

and I'm also deciding this motion for [a] new trial. . . . I have no doubt that both these guys were involved in this." (*Id.* at 58–59). In other words, the state trial court indicated that, while an average juror might find the withheld evidence material, the presiding judge was not persuaded. (*See id.*).

But *Brady* does not ask whether the withheld evidence persuades a particular judge; it asks whether "there is a reasonable probability that, had the [withheld] evidence been disclosed, the result of the proceeding would have been different." *Cone*, 556 U.S. at 469–70. And whether such a reasonable probability exists does "not depend on the idiosyncrasies of the particular decisionmaker . . . ." *Strickland v. Washington*, 466 U.S. 668, 695 (1984) (elaborating on *Brady* standard) (emphasis added). Moreover, "[a] reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75–76 (2012) (quoting *Kyles*, 514 U.S. at 434).

Here, the state trial court expressly admitted that the withheld evidence might have been sufficient to result in a different outcome before a jury. Nonetheless, the state trial court judge denied Petitioner a new trial, on the basis that the withheld evidence did not personally persuade him. By analyzing Petitioner's *Brady* claim under a subjective rather than an objective standard, the state trial judge misapplied federal law on Petitioner's post-conviction *Brady* claim. This finding alone warrants habeas relief.

Additionally, however, based on transcript of the new trial hearing, the state trial court's decision relied on facts that were not in evidence. At the new trial hearing, Dr.

Heinig testified that, according to the laboratory notes, alleles consistent with Allen's DNA were heavily present on the wig, and that, based on this heavy presence, Allen had likely worn the wig, rather than merely touched it. (*Id.* at 15, 17–18, 32–34). In order to square this testimony with its previous theory of liability—that Petitioner had actually worn the wig and Allen had merely touched the wig on the day of the robbery—the state trial court <u>mused</u> as follows: "[I]t could very possibly be that [] Allen wore this outfit . . . on other robberies . . . , that's why [Allen] has a heavy presence of DNA on it, and that would mask [Petitioner's] DNA when he wore it." (Doc. 12-11 at 61).

To be sure, Dr. Heinig testified that it is possible for one's DNA to mask another's—for instance in a "quick touch situation." (*Id.* at 24–27, 37–38, 47). Thus, in theory, Allen's use of the wig on prior robberies could explain both a heavy presence of Allen's DNA and could possibly account for the complete absence of Petitioner's DNA. But the problem is that no testimony was presented at the bench trial that Allen had worn the wig on previous occasions. By assuming the opposite, the trial court unreasonably relied on facts not in evidence. Thus, the state trial court's rejection of Petitioner's *Brady* claim was unreasonable under the AEDPA standard.

### 3. *Relief*

Based upon the foregoing, with regard to the Sixth Circuit's second point of inquiry, this Court concludes that, upon an analysis of the merits of Petitioner's *Brad*y claim, habeas relief is appropriate.

### C. Merits of the IAAC Claim

Finally, the Sixth Circuit instructed this Court to consider the merits of Petitioner's IAAC claim. (Doc. 99 at 35).

With regard to this final point of inquiry, the Magistrate Judge concluded that it was not necessary to reach the merits of both Petitioner's *Brady* claim and Petitioner's IAAC claim:

> The remedy for the *Brady* violation will be the issuance of a conditional writ of habeas corpus. In obedience to that writ, the State will either release [Petitioner] or retry and reconvict him. In either even[t], the judgment of conviction will be vacated. Whether it is replaced with an unconditional release or a new judgment of conviction which will then be appealable, the question of whether [Petitioner] received ineffective assistance of appellate counsel on his first direct appeal will be moot.

(Doc. 115 at 12–13).

In other words, the Magistrate Judge concluded that, as the remedy for the State's *Brady* violation is a writ of habeas corpus, and as a writ of habeas corpus will invalidate Petitioner's prior conviction, it is not necessary to determine whether, on appeal from that prior conviction, Petitioner's appellate counsel was ineffective. (*See id.*). On review, this Court completely agrees with the Magistrate Judge's conclusion. *See also Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) ("Because we conclude that the Louisiana courts' denial of Wearry's *Brady* claim runs up against settled constitutional principles, and because a new trial is required as a result, we need not and do not consider the merits of his ineffective-assistance-of-counsel claim.").

## D. Respondent's Remaining Objections

Most of Respondent's objections deal with the fact that the Magistrate Judge relied on the Sixth Circuit's June 18, 2019 Opinion and on the law of the case doctrine, as opposed to conducting his own review, in determining whether Petitioner's *Brady* claim was meritorious. (Doc. 116 at 1 (claiming that the Magistrate Judge did not perform the analysis required by the Sixth Circuit on remand); *id.* at 5 (claiming that it would be "manifestly unjust" to apply the law of the case doctrine in this case)). However, as this Court has conducted a thorough review of Petitioner's *Brady* claim, and as this Court has reached the same conclusion as the Magistrate Judge (and the Sixth Circuit, for that matter), these objections are now moot.

Respondent does raise three other objections. (*See id.*). However, as set forth *infra*, the Court does not find any of them persuasive.

First, Respondent argues that the laboratory notes are neither exculpatory nor impeachment evidence under the standard set forth in *Brady*. (*Id.* at 2, 6–10). More specifically, Respondent claims that neither the laboratory notes nor Dr. Heinig's testimony supports Petitioner's theory of the case: "that Allen and not [Petitioner] wore an incriminating wig to commit the offenses." (*Id.* at 2).

But this Court disagrees. As an initial mater, this Court has already concluded that both the laboratory notes and Dr. Heinig's testimony support Petitioner's theory of the case for the reasons set forth in section III.B.1, *supra*. And, to the extent that Respondent suggests that the laboratory notes and Dr. Heinig's testimony must <u>prove</u> that Petitioner is innocent to qualify as *Brady* material, Respondent misconstrues the *Brady* standard. *See*

*Kyles*, 514 U.S. at 434 (stating that the *Brady* standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal" (citing *Bagley*, 473 U.S. at 682)).

Second, Respondent argues that the First District has already adjudicated Petitioner's *Brady* claim in its February 7, 2011 decision and found that the undisclosed evidence was not material. (Doc. 116 at 3, 5). Respondent points to the portion of the First District's decision, which states that the undisclosed laboratory notes "could not 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (*Id.*; Doc. 75 at 201 (quoting *Kyles*, 514 U.S. at 435)).

However, as properly set forth in the Report and Recommendation, while the First District <u>considered</u> the *Brady* issue in the resolving the IAAC claim, the First District did not actually <u>render a decision</u> on Petitioner's *Brady* claim. (*Accord* Doc. 115 at 4–6). Indeed, as the Sixth Circuit has already noted in the context of this case: "that a state court [has] in fact rejected an IAAC claim brought under Rule 26(B) as meritless is not dispositive of [the merits of the underlying claim]." (Doc. 99 at 28).

Thus, as set forth in Section III.A, *supra*, the state trial court's decision (not the First District's) is before this Court for AEDPA review. And as set forth in Section III.B, *supra*, the state trial court unreasonably applied the law/facts while adjudicating Petitioner's *Brady* claim. Accordingly, Petitioner is entitled to habeas relief—regardless of the statements, made by the First District, in passing, while adjudicating the IAAC claim.

Finally, Respondent claims that, based on the Sixth Circuit's remand instructions, this Court must conduct a review of Petitioner's IAAC claim as well as Petitioner's *Brady* claim. (Doc. 116 at 2–5). And, in the course of its argument, Respondent makes the rather cryptic statement that "this petition [cannot] be decided without reviewing the *Brady* claim in the context of the [IAAC claim]." (*Id.* at 5).

This Court disagrees. To be sure, the Sixth Circuit remanded the case to this Court for a consideration of the merit of Petitioner's *Brady* and IAAC claims. (Doc. 99 at 32, 35). However, Petitioner's *Brady* and IAAC claims are two <u>separate</u> grounds, which offer two <u>separate</u> remedies. As Petitioner has prevailed on the first ground (the *Brady* claim), there is no need to consider the merits of the seventh ground (the IAAC claim), because the relief provided for in the first ground (a writ of habeas corpus with the possibility of retrial), is superior to and entirely moots the relief provided for in the seventh ground (a writ of habeas corpus unless the State reopens the appeal). (*Accord* Doc. 115 at 12–13); *Wearry*, 136 S. Ct. at 1006 (declining to consider an ineffective-assistance-of-counsel claim where the petitioner had already prevailed on a Brady claim and was therefore entitled to a new trial). Thus, requiring this Court to reach a determination as to whether Petitioner would also prevail on the IAAC claim would serve no added purpose.[13]

---

[13] It bears noting that this Court's resolution of the *Brady* claim would drive any merits-based decision as to the IAAC claim. *See Goff v. Bagley*, 601 F.3d 445, 466–67 (6th Cir. 2010) (holding that the Supreme Court of Ohio's conclusion that appellate counsel was not ineffective for failing to raise "an obviously winning claim" on direct appeal was "an unreasonable application of federal law").

## E.  Conditional v. Unconditional Writ of Habeas Corpus

Having determined that a writ of habeas corpus is required, the Court must

consider whether to issue the writ conditionally or unconditionally.

> By its terms, § 2254 empowers the district court to achieve a
> single end: to terminate the petitioner's unconstitutional
> custody.  A district court can achieve that end by granting an
> absolute [*i.e.*, unconditional] writ, which itself vacates the
> unconstitutional judgment and orders the petitioner
> immediately released.  *Satterlee v. Wolfenbarger*, 453 F.3d
> 362, 370 (6th Cir. 2006).  Or, as an "accommodation[]" to the
> state, the court can grant a conditional writ, which requires the
> state either to vacate the unconstitutional judgment or to
> replace it with a constitutional one (by retrying him) within a
> certain period of time.  *Id.* at 369.

*Gillispie v. Warden, London Corr. Inst.*, 771 F.3d 323, 329 (6th Cir. 2014).

To be clear, the issuance of a writ, whether conditional or not, does not bar re-

prosecution absent "extraordinary circumstances, such as when the state inexcusably,

repeatedly, or otherwise abusively fails to act within the prescribed time period or if the

state's delay is likely to prejudice the petitioner's ability to mount a defense at trial . . . ."

*Satterlee*, 453 F.3d at 370 (quotation marks and citation omitted); *Eddleman v. McKee*,

586 F.3d 409, 413 (6th Cir. 2009) ("The power to 'release' a prisoner under § 2254

normally is not a power to release him forever from the underlying charge.  It is the

power, instead, only to release him from custody pursuant to the unconstitutional

judgment.").  Rather, the issuance of a conditional writ serves to "delay the <u>release</u> of a

successful habeas petitioner in order to provide the State an opportunity to correct the

constitutional violation found by the court."  *Hilton v. Braunskill*, 481 U.S. 770, 775

(1987) (emphasis added).

District courts generally favor conditional writs of habeas corpus out of a "concern for comity among the co-equal sovereigns." *Gentry v. Deuth*, 456 F.3d 687, 692 (6th Cir. 2006). Nevertheless, "federal courts have been given broad discretion in fashioning [habeas corpus] relief." *Id.* at 696 (quotation marks and citation omitted); *see also Irvin v. Dowd*, 366 U.S. 717, 728–29 (1961). Indeed, "[f]ederal courts are authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus matters 'as law and justice require.'" *Hilton*, 481 U.S. at 775 (emphasis added).

Here, the Magistrate Judge recommended that this Court issue a conditional writ of habeas corpus, requiring the State to retry Petitioner within six months of the date of judgment, or otherwise release Petitioner unconditionally. (Doc. 115 at 13). At the time the Magistrate issued the Report and Recommendation, the proposed remedy was entirely appropriate. (*Accord* Doc. 99 at 35 n.5 (citing the same remedy)).

However, after the Magistrate Judge issued the Report and Recommendation, an unprecedented situation enveloped the country. The United States fell victim to the COVID-19 pandemic.

On April 4, 2020, Petitioner filed a notice informing this Court that a staff member at the Toledo Correctional Institution ("TCI")—the correctional facility in which Petitioner is housed—has recently tested positive for COVID-19 (the "Notice"). (Doc. 122 at 1). In the Notice, Petitioner states that he has a preexisting condition which renders him particularly susceptible to becoming critically ill from COVID-19. (*Id.* at 2). Thus, Petitioner asserts that, given his particular vulnerability to serious illness, as well as

"the compelling nature of his case," his continued detention, "is not in the interests of justice, health, or safety . . . ." (*Id.* at 3).

Upon receipt of Petitioner's Notice, this Court issued a Notation Order, ordering the parties to:

> **[C]onfer** by telephone on the following issue: whether, **if** this Court **were** to issue a conditional writ of habeas corpus as to Petitioner, the parties could agree that, during the conditional period, Petitioner would be released on the condition that he remain on home incarceration (with any other appropriate conditions or monitoring requirements), instead of remaining detained at TCI.

(Not. Order, Apr. 6, 2020 (emphasis added)). The Notation Order specifically explained that, "[s]uch a stipulation would allow the State of Ohio to have a full six-month period (subject to reasonable extension if sought and granted by this Court) in which to determine whether to retry Petitioner, while also affording Petitioner the benefit of a custodial environment that would be conducive to his own health and safety during this unprecedented pandemic." (*Id.*)

The parties were given a deadline of April 8, 2020 at 12:00 p.m. by which to complete the required telephone conference and apprise the Court as to whether some agreement could be reached between the parties. (*Id.*)

On April 8, 2020 at 9:47 a.m., this Court received an email from Petitioner's counsel, stating that despite her many attempted calls and emails, Respondent's counsel had been unresponsive. In other words, notwithstanding this Court's clear Notation Order, Respondent's counsel wholly failed to participate in the required telephone conference. Regardless, Petitioner's counsel offered the Court suggested bond

conditions, and alternative proposals by which the Court could release Petitioner with appropriate bond restrictions.[14]

At 10:02 a.m.—*i.e.*, within fifteen minutes of Petitioner's counsel's email— Respondent's counsel also submitted an email to the Court, stating merely that: "The Warden will submit a response shortly." Then, at 10:53 a.m., Respondent filed a written response in opposition to Petitioner's Notice (the "Response"). (Doc. 123). In the Response, Respondent mischaracterized the Court's Notation Order as "**suggest[ing]** that the parties stipulate to the conditions of [Petitioner]'s release **pending a decision on his petition** . . . ." (*Id.* at 1 (emphasis added)). Respondent further asserted that he could not enter into such a stipulation, as to do so would be both unnecessary under the circumstances and outside of his authority. (*Id.* at 4). Respondent also argued, *inter alia*: that there have been no confirmed COVID-19 cases in TCI inmates; that TCI is taking measures to ensure its inmates' health; and that Petitioner would likely be safer at TCI than on home incarceration. (*See id.*). At 11:05 a.m., Respondent sent the Court another email reiterating the position proffered in the Response, *i.e.*, that he was unable to enter

---

[14] Petitioner's counsel also suggested that, in absence of a stipulation between the parties, this Court could consider Petitioner's release in the context of a motion for bond (following appropriate briefing). Based on this Court's decision to issue an unconditional writ of habeas corpus, *infra*, Petitioner's suggestion is moot. Nonetheless, the Court will note that, having considered the factors applicable to a motion for release on bond under Federal Rule of Appellate Procedure 23, the Court concludes that Petitioner's would very likely prevail on such a motion, separate and apart from the analysis set forth *infra*. *See O'Brien v. O'Laughlin*, 557 U.S. 1301, 1302 (2009) ("There is a presumption of release pending appeal where a petitioner has been granted habeas relief," which can only be overcome if the party opposing release prevails on the following factors: (1) whether the party opposing release has made a strong showing that he is likely to succeed on the merits; (2) whether the party opposing release will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the petitioner; and (4) where the public interest lies. (citing *Hilton*, 481 U.S. at 774)).

into such a stipulation and that Petitioner's "release is not necessary, and not legally justified."[15]

Finally, on April 8, 2020 at 12:00 p.m., Petitioner filed a reply in support of Petitioner's Notice (the "Reply"). (Doc. 124). In the Reply, Petitioner disputed Respondent's contentions regarding Petitioner's safety at TCI, and asked this Court to order Petitioner's release from TCI within 24 hours. (*See id.*).

As the Court has decided that it is proper to issue a writ of habeas corpus as to Petitioner (*see* Section III.B, *supra*), and as the parties have not been able to reach an agreement as to home incarceration, this Court must now decide whether it is appropriate, under the exigent circumstances posed by the COVID-19 pandemic, to issue a conditional or an unconditional writ of habeas corpus.

Here, the Court concludes that the issuance of an unconditional writ of habeas corpus is proper and wholly warranted. The COVID-19 pandemic presents a real and substantial risk to the health and safety of every person, not just in Ohio or the United States, but all over the world.[16] And the threat is particularly significant—indeed,

---

[15] Notably, neither Respondent's filed response nor his emails to the Court fulfill the obligation to abide by this Court's duly entered Notation Order, which required the parties to confer by telephone on whether, if this Court were to issue a conditional writ of habeas corpus, the parties could agree that Petitioner would remain on home incarceration during the conditional period. Respondent's failure to abide by this Court's Order could effectively be construed as a waiver of any argument that the issuance of an unconditional, as opposed to a conditional, writ of habeas corpus is appropriate. (Not. Order, Apr. 6, 2020). Nonetheless, given this Court's ultimate decision under the law, as set forth *infra*, the Court need not reach the waiver issue.

[16] As of April 8, 2020, there were at least 1.4 million confirmed cases globally, with at least 86,000 deaths resulting—suggesting a fatality rate of approximately 6%. *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (April 8, 2020), available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (updated regularly).

**critical**—as to those individuals who suffer from preexisting conditions—including Petitioner, who has hypertension.[17]  (Doc. 122 at 2).  Indeed, Petitioner states that his health results in him being "designated as a 'critical care' inmate at TCI, which means that he is evaluated by medical staff at TCI twice a month."  (*Id.*)

While the Court appreciates that TCI is doing all it can to maintain the safety of all inmates and staff, there is no question that any close-quartered environment, particularly prisons, poses a significantly heightened risk for the spread of infectious diseases.[18]

For these reasons, the Court concludes that, under the unique circumstances of this case, and pursuant to the Court's broad discretion to "dispose of habeas matters 'as law and justice require,'" Petitioner's unconditional release from custody is required.  *Gentry*, 456 F.3d at 696 (quoting 28 U.S.C. § 2243).

In granting this relief, this Court by no means precludes the State from recharging and retrying Petitioner in accordance with the applicable law.

---

[17] *See, e.g.*, *New data on New York coronavirus deaths: Most had these underlying illnesses; 61% were men*, USA Today, available at https://www.usatoday.com/story/news/health/ 2020/04/07 new-york-coronavirus-deaths-data-shows-most-had-underlying-illnesses/2960151001/  (last updated April 7, 2020) ("The majority of New York's more than 4,700 deaths due to coronavirus were among men, and 86% of all deaths were among people who had underlying illnesses, such as hypertension and diabetes, new state data shows. . . .  The leading underlying illness was hypertension, which showed up in 55% of the deaths.").

[18] *See, e.g., Prisons And Jails Change Policies To Address Coronavirus Threat Behind Bars*, NPR, available at https://www.npr.org/2020/03/23/818581064/prisons-and-jails-change-policies-to-address-coronavirus-threat-behind-bars (March 23, 2020) (stating that "jails and prisons are considered perfect incubators for the coronavirus to potentially take hold").

## IV.  CONCLUSION

As required by 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), the Court has reviewed the comprehensive findings of the Magistrate Judge and considered *de novo* all of the filings in this matter.  Upon consideration of the foregoing, the Court finds that the Report and Recommendation should be and is hereby adopted, subject to the modifications stated herein.

Accordingly:

1.    Respondent's Objections (Doc. 116) are **OVERRULED**;

2.    The Report and Recommendation (Doc. 115) is **ADOPTED** as modified, *supra*; and

3.    The Court **ISSUES** an **<u>unconditional</u>** writ of habeas corpus, requiring the State to immediately release Petitioner from custody, whereupon the State can decide whether to retry Petitioner in accordance with applicable law.

**IT IS SO ORDERED.**

Date:  April 9, 2020

Timothy S. Black
United States District Judge